**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 95-11153

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JUAN FRANCISCO TREVINO,also known as Kiko Ozuna;
ARMANDO MARTIN TREVINO, also known as Gordo;
PEDRO SANCHEZ, also known as Sanchez;
PABLO DELUNA, also known as Picho;
JORGE ESPINOSA, also known as El Pato;

Defendants-Appellants.

Appeals from the United States District Court
For the Northern District of Texas
(3:95-CR-189-R)

June 30, 1997

Before JONES, STEWART, and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:[*]

Defendants-appellants, Juan Francisco Trevino, Pablo DeLuna, Armando Martin Trevino, Jorge Espinoza, and Pedro Sanchez, were convicted of conspiracy to possess with intent to distribute and to distribute more than 1000 kilograms of marijuana, 21 U.S.C. §§ 841(a)(1) & 846, and sentenced to imprisonment.

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

The issues presented on appeal are (1) whether the district court erred in failing to dismiss the original indictment with prejudice based on the denial of statutory speedy trial rights; (2) whether there was sufficient evidence to support the convictions of Juan Trevino, Armando Trevino, and Pedro Sanchez; (3) whether the district court erred by admitting evidence of an extraneous offense committed by Pablo DeLuna; (4) whether there was prejudicial prosecutorial misconduct; (5) whether the district court erred in giving an *Allen* charge to the jury; (6) whether the district court erred in sentencing Juan Trevino, Pedro Sanchez, Jorge Espinoza, and Armando Trevino. Finding no reversible error, we affirm the appellants' convictions and sentences, except that Jorge Espinoza's sentence is vacated and his case is remanded for resentencing.

BACKGROUND

Appellants were originally indicted on October 13, 1994, along with 8 others, Abraham "Benny" Padilla, Abel Lopez, Sr., Abel Lopez, Jr., Francisco Isaac, Fernando "Vanna" Quiroz, Hipolito "Polo" Ortiz, Oscar "Pelon" DeLeon, and Edel Isaac, for conspiracy to possess with intent to distribute and distribution of more than one thousand kilograms of marijuana and related offenses. On October 18, 1994, Juan Trevino, Armando Trevino, and Pedro Sanchez appeared before a judicial officer. On November 18, 1994, the case was set for trial in January 1995. On January 4, 1995, the case

2

was reset for trial for April 3, 1995. On March 29, 1995, the court granted Pedro Sanchez's motion for continuance and the case was reset for trial in May 1995. On May 16, 1995, the court granted Armando Trevino's motion for continuance and reset the trial for June 16, 1995. On May 26, 1995, Juan Trevino filed a motion to dismiss for violation of the Speedy Trial Act, 18 U.S.C. § 316(c)(1), which provides for trial to be held within 70 days of the date the defendant first appeared before a judicial officer or the date of the indictment, whichever is later. On June 15, 1995, the trial court held a hearing on Juan Trevino's speedy trial motion, granted the motion, and dismissed the October 13, 1994 indictment without prejudice stating that it was the court's fault that the speedy trial act had not been complied with.

On June 7, 1995, the Government obtained a second indictment charging that the appellants herein conspired to possess with intent to distribute and to distribute more than 1,000 kilograms of marijuana. The indictment alleged that the conspirators acquired large sums of marijuana from Mexico and transported the marijuana from Laredo to Dallas, Texas.

At trial, several co-conspirators testified regarding the operations of the conspiracy. Everado Ramirez, the Government's first witness, testified that Tovar Ozuna introduced him to Juan Trevino who offered him a job of transporting marijuana to Dallas. Ramirez's first duty was to store marijuana at his house for several days and then bring it to Pablo DeLuna's house, who was to

3

transport it to Dallas. Ramirez was paid $10 per pound of marijuana that he stored and transported.

The following month, at Tovar Ozuna's request, Ramirez agreed to store and deliver marijuana that was to be transported to Dallas. Tovar's job for Juan Trevino was to bring marijuana across the river from Mexico to Ramirez. Tovar delivered about 250 pounds and Ramirez brought it to Pablo DeLuna's house where it was to be stored and later transported to a Border Freight Company 18 wheeler.

Ramirez testified that he participated in similar marijuana deliveries from Laredo to Dallas about three times a month during a 12 to 18 month period and that the largest load of marijuana he had stored was about 600 pounds. After a few months, Ramirez began to travel with Fernando Quiroz, Pablo DeLuna, and Joe Chavez, to Dallas to obtain earlier payments. He said he made 15-20 such trips to Dallas. Ramirez testified that he would check into a Dallas motel, and page Juan Trevino's brother, Jose, who would bring him his payment.

Ramirez testified that on some occasions the marijuana was unloaded in San Antonio into a car that he followed to Dallas as instructed by Pablo DeLuna. Ramirez recalled that on one occasion a Border Freight truck was unloaded at a house. Later, he said, the conspirators used Suburbans to haul marijuana on private roads through a large ranch to bypass law enforcement checkpoints. Ramirez testified that his association with the conspiracy

4

terminated when Juan Trevino told him not to come around anymore because he thought they were being watched.

Hipolito "Polo" Ortiz testified that he became involved in the conspiracy when Benny Padilla offered to pay him $4,000 to drive a Suburban from Laredo to Dallas with a load of marijuana. Ortiz worked with Joe Sanchez, Pablo DeLuna, Jorge Espinoza, Fred Tejeda, Everado Ramirez, Fernando Quiroz, Joe Chavez, and Juan Trevino in picking up, loading, driving, and delivering marijuana. He said that some of the marijuana was transported in Border Freight trucks, especially when the weather was good, because they made it through checkpoints easier. Ortiz identified two Government exhibits as photographs of marijuana packages belonging to Juan Trevino and Abel Lopez.

In May of 1993, Ortiz, Fernando Quiroz, and Abel Lopez, Jr., were arrested at a motel in Mesquite, Texas for possessing 300 pounds of marijuana that had been brought up Dallas from Laredo, Texas. Ortiz testified that this offense was the subject of a pending state charge against him as well as being part of the basis for the federal conspiracy indictment in the case at bar to which he had pleaded guilty.

Juan Barraza testified that he worked for Able Lopez, Sr. and Abel Lopez, Jr. transporting marijuana and delivering money in the Dallas area. After about six months, Barraza was sent to Laredo to deliver $5,000 to Abel Lopez, Sr. Barraza "escorted" 18 wheelers hauling marijuana from Laredo to Dallas. He identified Jorge

Espinoza as one of the truck drivers. Barraza testified that he knew of 12 or 13 instances when marijuana loads averaging about 500 pounds each were delivered to Dallas by trucks. Barraza admitted he personally drove trucks loaded with marijuana on two occasions, for which he was paid $45,000 per trip. Otherwise, Barraza was paid approximately $3,000 per week for assisting in the operation. Barraza testified that on one occasion, he Pablo DeLuna, and Selso Pena were sent to Laredo by Abel Lopez, Jr. to search for marijuana that Pablo DeLuna left in a field. He said Pablo DeLuna started out with 500 pounds in Laredo but arrived in Dallas with only half of the load.

Joe Chavez testified that in or about March of 1993, he became involved in the conspiracy through Benny Padilla. His initial job involved loading more than 1000 pounds of marijuana into a Suburban at a house in Laredo. Chavez said he and Padilla's brother "Chuko" took the marijuana to Jorge Espinoza's mother's house where they and Jorge Espinoza's brother placed the marijuana in a room containing marijuana-stuffed duffel bags. At Padilla's request, Chavez returned to the house and, with "Chuko" and Jorge Espinoza, loaded the marijuana into a Border Freight truck. The following morning the truck was driven to Dallas.

Chavez's next job was to escort Suburbans loaded with marijuana. Chavez explained that "escorting" called upon him to drive his car behind or in front of the Suburban, and to interfere with any law enforcement officer's attempt to pull the Suburban

6

over. Chavez admitted to passing a state trooper on the shoulder of the road to divert the officer's attention from a Suburban loaded with marijuana. Chavez escorted about 13 loads of marijuana from Laredo to Dallas, and was paid $600 per load.

Chavez detailed the route the conspirators took and how they evaded checkpoints: A conspirator would drive a Suburban out of Laredo on Highway 359. Before reaching Bruni, Texas, the Suburban driver would take a private road through a ranch and reenter the public highway after bypassing a checkpoint. Chavez, as "escort" would drive through the highway checkpoint and wait for the Suburban at a restaurant in Bruni. Chavez testified that on one occasion while waiting at the restaurant in Bruni, Armando Trevino approached and told him to catch up with the Suburban which had already gone by.

After escorting a marijuana load to Dallas, he would stay with it at a Dallas area motel where the Suburban would be picked up and later brought back empty. Chavez testified that he subsequently learned that the marijuana was being delivered to Juan Trevino in Dallas. Chavez testified that beginning in July of 1993, he drove Suburbans rather than escorting them. Chavez made approximately 13 trips and was paid $6,000 per trip. Before his first trip, Chavez was shown by Armando Trevino how to drive the Suburban through the Staggs ranch. Armando Trevino drove Chavez in his pickup from the exit of the ranch at Highway 2050 through the ranch to the entrance at Highway 359, a distance of 35 miles.

7

Armando Trevino gave Chavez keys and combinations to get through cattle guard gates; according to Chavez, Armando Trevino was paid $35 per pound for permitting use of the ranch. Chavez then made trips two or three times per week, using the combinations and keys, and driving loads through the ranch. Chavez testified that he would drive through the ranch at 6:30-7:00 A.M. in order to avoid running into the Border Patrol on the road; a Border Patrol shift change occurred at this time.

In December of 1993, Joe Chavez first met with DEA Special Agent Armando Ramirez at the DEA office in Laredo to find out how to recover money that had been seized; Chavez had been stopped for a traffic violation and $4,000 cash and jewelry had been seized. Chavez returned to the DEA office later that month, however, and became a confidential informant. He did so because "he had a feeling that this thing . . . was going to be going down."

In addition to the testimony of the conspirators, the Government also introduced evidence of the arrests of the conspirators and the seizures of marijuana and other inculpatory contraband from them. First, DEA Special Agent Victor Routh, the lead case agent, testified that in May 1993 Fernando Quiroz, Abel Lopez, and Hipolito Ortiz were arrested at a hotel in Mesquite, Texas and that 300 pounds of marijuana in their possession was seized.

Evidence of the September 8, 1993 arrest of Jose and Javier Sanchez was also introduced. Laredo Police Officer Jesus

Montemayor testified that on September 7, 1993, he received a phone call from an anonymous tipster who stated that two individuals would be leaving Laredo the following day in a particular vehicle and that it was highly probable that the vehicle would be carrying marijuana. Officer Montemayor responded by setting up surveillance on a maroon Suburban parked near a mobile home. On September 8, 1993 the Suburban occupied by Jose and Javier Sanchez was stopped shortly after it departed and 622 pounds of marijuana was found in it. The Suburban was specially equipped with air shocks on the rear axle in order to disguise the heavy load. This arrest and seizure tended to corroborate Joe Chavez's testimony that he loaded the marijuana from a pickup truck into the Suburban the night before the arrest, that he left the keys with the Sanchez, and that he planned to "escort" the load to Dallas.

Border Patrol agent Darren Matthews testified that on October 5, 1993, appellants Jorge Espinoza and Pete Sanchez were arrested while driving a Border Freight 18 wheeler on Interstate 35 approximately 15 miles north of Laredo. Two hundred eighty-two pounds of marijuana stuffed in duffle bags was found inside the trailer of the truck. Both Sanchez and Espinoza told Border Patrol agent Matthews that they were not aware of the marijuana. In testifying about the arrest of Sanchez and Espinoza, Joe Chavez stated that Benny Padilla had told him to load up the Suburban and take it down to the Border Freight terminal. Chavez further testified that he, Espinoza, and Sanchez transported the marijuana

9

from the Suburban to the Border Freight 18 wheeler on the night of the arrest.

DEA agents Jackson and Ramirez testified as to the second arrest of Jose and Javier Sanchez that occurred on December 7, 1993. Pursuant to a tip from Joe Chavez that a Suburban containing marijuana would exit from the Staggs ranch heading toward Bruni, Texas, Jackson and Ramirez intercepted the vehicle occupied by Jose and Javier Sanchez and seized 309 pounds of marijuana, a key, and a piece of paper on which gate lock combinations were written.

On December 29, 1993, pursuant to a random check by the U.S. Customs Service, a vehicle driven by Juan Trevino was stopped and $47,984 was found. When the vehicle was stopped, Juan Trevino twice denied that he had more than $10,000 in currency. Trevino pleaded guilty to a currency violation, and the money was forfeited.

On January 24, 1994, Joe Chavez informed DEA Special Agent Armando Ramirez about a delivery of marijuana to be made in Dallas on January 26. Agent Ramirez, acting undercover, assisted Chavez in loading approximately 463 pounds of marijuana into a Suburban from a mobile home in Laredo. Upon arrival in Dallas, agents arrested Ricky Trevino and Abel Lopez, Jr. when they attempted to pick up the marijuana from Joe Chavez. Chavez testified that some of the confiscated marijuana was destined for or "belonged to" Juan Trevino.

Pursuant to this arrest, the Government seized an

10

address/phone book belonging to Joe Chavez that was left on a table in a bar at the Holiday Inn where the arrest took place. The book contained the Staggs ranch phone number and a cellular phone number assigned to Armando Trevino. The book also contained a phone number listed next to the name "Kiko," Juan Trevino's alias. The number was assigned to "Sanwana Trevino" at an address that the lien abstracts showed to be in the name of Juan Trevino. Other conspirators' names, addresses and phone numbers also appeared in the book.

Louisiana State Trooper Jim Stephens testified that on March 27, 1994, while patrolling Interstate 20, he witnessed suspicious activity of the occupants of a vehicle with Texas license plates at a rest area in Lincoln Parish, Louisiana. Trooper Stephens also saw an empty car with Kentucky license plates. After exiting the rest area, Stephens set up a stationary radar on the shoulder of Interstate 20. Shortly thereafter, the car with the Kentucky license plates exited the rest area and passed Stephens, which was followed within a mile by the car with the Texas license plates he had observed at the rest area. Stephens followed and eventually stopped the Texas vehicle because of the odd way it was being driven. Pablo DeLuna was a passenger in this car. Stephens, suspecting something was amiss, radioed to have the Kentucky car stopped. Stephens' suspicion was further aroused by the discovery of a spare tire in the trunk that did not match the car and a cap on the back seat of the car that was imprinted with the words

11

"Stone's Garage Dixon, Kentucky."   Stephens requested a K-9 unit. The K-9 dog arrived and alerted to a jacket on the backseat of the car.

Meanwhile, the Kentucky car was stopped by Louisiana State Trooper Brown about 21 miles east of where Trooper Stephens stopped the Texas car.  Brown found a bale of marijuana in the spare tire well of the car.  The spare tire found in the Texas car matched the Kentucky car stopped by Brown.

Other evidence was introduced at trial to corroborate the unindicted co-conspirators' testimony.  Frank Staggs, the owner of the ranch that the Suburbans passed through to evade border checkpoints testified that in 1993 the caretaker of the ranch was Armando Trevino.  Staggs identified the numbers on Government's exhibit 29 (the paper seized from Jose Sanchez on December 7, 1993) as the combinations to two gate locks on the east side of the ranch.  The Government, in addition to Joe Chavez's address book confiscated pursuant to the arrest of Abel Lopez, Jr. and Ricky Trevino, introduced telephone and motel records involving the conspirators.

Following their convictions, Armando Trevino was sentenced to 188 months imprisonment; Pablo DeLuna was sentenced to 405 months imprisonment; Pedro Sanchez was sentenced to 63 months imprisonment; Juan Trevino was sentenced to 264 months imprisonment; Jorge Espinoza was sentenced to 120 months imprisonment.  Each appellant was sentenced to five years of

12

supervised release following his prison term.  The appellants timely appealed their convictions and sentences.

DISCUSSION

A.  SPEEDY TRIAL ACT

As a threshold issue, we must determine whether the district court erred in failing to dismiss the original indictment with prejudice based on denial of speedy trial rights.  18 U.S.C. § 3162(a)(2) provides:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among  others, each of the following factors:  the seriousness of the offense; the facts and circumstances of the case which led to the dismissal;  and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

In the present case, the charged offenses were obviously quite grave. *See United States v. Taylor*, 487 U.S. 326, 338 (1988)(controlled substance offenses are serious offenses); *United States v. Johnson*, 29 F.3d 940 (5th Cir. 1994) (conspiracy to possess with intent to distribute 262 pounds of marijuana was serious). *See also United States v. Melguizo*, 824 F.2d 370, 371 (5th Cir.), *cert. denied*, 487 U.S. 1218 (1987)(potential 10 year sentence is sufficient indication that offense was serious).

The facts and circumstances leading to the dismissal included

the following:  The trial judge stated that he was solely responsible for not commencing a trial within the Speedy Trial Act's deadline.  The record evidence does not describe the delay to anyone other than the district judge.  Under the circumstances of this case, reprosecution did not seriously impact the administration of the Speedy Trial Act in particular, or the administration of justice in general.  We conclude that the district court did not commit reversible error in dismissing the first indictment without prejudice.

B.  SUFFICIENCY OF THE EVIDENCE

Appellants, Juan Trevino, Armando Trevino, and Pedro Sanchez, challenge the sufficiency of the evidence to sustain their convictions for conspiracy to possess with intent to distribute and to distribute marijuana.  To establish a drug conspiracy under  21 U.S.C. §§ 841(a)(1) and 846, the Government must prove:  1) the existence of an agreement between two or more persons to violate federal drug laws;  2) the  defendant's knowledge of the agreement;  and 3) the defendant's voluntary  participation in the agreement. *United States v. Gallo*, 927 F.2d 815, 820 (5th  Cir. 1991).  *See also United States v. Gonzalez*, 79 F.3d 413, 423 (5th Cir. 1996).  "The Government is not required to prove the existence of the conspiracy and the agreement between the co-conspirators and the defendant by direct evidence, but may present circumstantial evidence, such  as the co-conspirator's concerted actions, from

14

which the jury can infer that a conspiracy existed." *Id.* The existence of the agreement, the defendant's knowledge of the agreement, and the defendant's participation in the conspiracy may be inferred from the "'development and collocation of circumstances.'" *Id.* (citing *United States v. Lentz*, 823 F.2d 867, 868 (5th Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 354, 98 L.Ed.2d 380 (1987) (quoting *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982)). The mere presence at the scene of the crime or close association with co-conspirators will not alone support an inference of conspiracy but are factors that the jury may consider in finding conspiratorial activity. *Id.* (citing *United States v. Magee*, 821 F.2d 234, 239 (5th Cir. 1987)).

In reviewing for sufficiency of the evidence, we must affirm if a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Jaras*, 86 F.3d 383, 386 (5th Cir. 1996). We thus consider the evidence, all reasonable inferences drawn therefrom, and all credibility determinations in the light most favorable to the prosecution. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *Jaras*, 86 F.3d at 387; *United States v. Resio-Trejo*, 45 F.3d 907, 910-11 (5th Cir. 1995). Our role does not extend to weighing the evidence or assessing the credibility of

witnesses. *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469; *Jaras*, 86 F.3d at 387. The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. *Jaras,* 86 F.3d at 387; *Salazar*, 66 F.3d at 728; *Resio-Trejo*, 45 F.3d at 911 (quoting *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)).

As for Juan Trevino, the record reflects sufficient testimony and other evidence introduced at trial from which a jury could infer that there was an agreement to traffic marijuana, that Juan Trevino had knowledge of the agreement, and that Juan Trevino voluntarily participated in the conspiracy: (1) Everado Ramirez testified that he stored and delivered loads of marijuana from Laredo to Dallas for Juan Trevino ; (2) Hipolito Ortiz testified that he drove loads of marijuana for Benny Padilla from Laredo to Dallas that Pablo DeLuna and Benny Padilla said were to be delivered to Juan Trevino; (3) Joe Chavez testified that he made numerous trips to Dallas escorting loads of marijuana or driving loads himself that Benny Padilla told him were destined for Juan Trevino and that the marijuana seized pursuant to the arrest of Jose and Javier Sanchez was one of the cargoes that was intended for Juan Trevino; (4) cash in the amount of $47,984 was seized from

16

Juan Trevino on December 29, 1993 and became the subject of Trevino's guilty plea for currency violations; and (5) the appearance of Juan Trevino's nickname in a conspirator's address book next to a phone number assigned to one of his residences.

By the same token, there is abundant evidence supporting Armando Trevino's conviction: (1) Frank Staggs testified that in 1993 Armando Trevino was the caretaker of the Staggs ranch; (2) Joe Chavez testified that Armando Trevino showed him how to evade Border Patrol detection while transporting loads of marijuana by passing through the Staggs ranch; that Armando Trevino gave gate keys and lock combinations to Chavez; and that on one occasion Armando Trevino appeared in Hebronville, Texas and directed Chavez to catch up with a drug cargo vehicle that he was escorting to Dallas; (3) Chavez also testified that Armando Trevino was paid $35 per pound for the transit of marijuana through the ranch; (4)Jose and Javier Sanchez were apprehended with a cargo of marijuana on December 7, 1993 after passing through the Staggs ranch; (5) telephone records indicated numerous calls made between the fall of 1992 and the summer of 1994 from Benny Padilla to the Staggs Ranch and to Armando Trevino's cellular number; and (6) Armando Trevino's nickname was inscribed in Joe Chavez's address book beside Trevino's cellular phone number and the Staggs ranch number.

The evidence introduced at trial inculpating Pedro Sanchez was less extensive but nevertheless sufficient to require affirmance of

his conviction. Border Patrol agents apprehended Sanchez on October 5, 1993 as he was driving a Border Freight 18 wheeler with 282 pounds of marijuana in the trailer. Joe Chavez testified that Pedro Sanchez assisted him and Jorge Espinoza in loading the cargo of 282 pounds of marijuana into the trailer of the Border Freight 18 wheeler the night Sanchez was arrested.

Sanchez claims that the Government did not adequately prove the knowledge and voluntary participation elements of the offense. He argues that Joe Chavez's testimony was untruthful in general and insufficient in particular to establish that Sanchez knowingly and voluntary participated in loading marijuana into the Border Freight 18 wheeler.

Sanchez testified that on the night he was arrested he arrived at the Border Freight terminal in Laredo at about midnight and that while he was talking to Ernesto Castro, the security guard on duty, Joe Chavez approached and asked him whether he knew anyone from Carrizo Springs; that he responded that he did not; that that was the extent of the conversation with Chavez; and that he had not met Joe Chavez before. Sanchez further testified that when he got to the terminal, the trailer was already loaded and that he did not inspect the cargo. Sometime thereafter, Sanchez testified, Jorge Espinoza arrived and for about 20 minutes Espinoza inspected the cargo inside the trailer while Sanchez remained inside the cab of the 18 wheeler. After this inspection, Sanchez said Espinoza entered the cab of the 18 wheeler and they immediately departed.

18

Sanchez relies on the testimony of Ernestro Castro, the Border Freight security guard, who testified as a defense witness on Sanchez's behalf, to support his argument that the Government did not prove that he had knowledge of the conspiracy, or that he voluntarily participated in the conspiracy, and that the testimony of Joe Chavez was untrustworthy.

Castro only testified, however, that he saw Sanchez and Chavez conversing for three to five minutes but that he did not hear what they were talking about. Castro testified that from his guard shack where he was stationed he was relatively close to the 18 wheeler that Pete Sanchez drove (he described this distance to be about the same as the length of the courtroom), and that he neither saw anyone enter the trailer of Sanchez's 18 wheeler nor did he hear the trailer door being opened. He further testified, however, that the yard was dark; that there was only one light and that he remained in his guard shack during the time that Sanchez and Chavez were present.

Sanchez argues that Chavez's testimony failed to demonstrate that he had knowledge that marijuana was being transported on October 5, 1993, or that he voluntarily participated in the transport. Review of the record, however, clearly reveals sufficient evidence for a reasonable inference of Sanchez's knowledge and voluntary participation. Sanchez does not dispute the facts that he met Chavez at the Border Freight terminal, that he drove the truck away with Espinoza, or that the vehicle

contained a cargo of marijuana. These facts plus Chavez's testimony that Sanchez helped load the marijuana were sufficient to support a reasonable inference of knowing and voluntary participation. A conviction may be based on the testimony of one accomplice, even when uncorroborated, if the testimony is substantial on its face. *Jaras*, 86 F.3d at 387; *United States v. Gibson*, 55 F.3d 173, 181 (5th Cir. 1995); *United States v. Gadison*, 8 F.3d 186, 190 (5th Cir. 1993). Sanchez's real complaint is that the testimony of his co-conspirator was inherently unreliable or "incredible," and thus cannot form the basis for establishing knowledge and voluntary participation, because Chavez demonstrably lied on the witness stand. At trial the jury assessed the credibility of Sanchez, Chavez, and Castro; obviously, with respect to any material conflicts, it placed more value on Chavez's testimony. We may not invade the jury's province by substituting our own credibility determinations for those of the jury. *Jaras*, *id*; *United States v. Lopez*, 74 F.3d 575, 578 (5th Cir. 1996). Chavez's testimony does not rise to the level of "incredibility" because of the introduction of contrary testimony. See *Jaras*, *id*. (citing *United States v. Casel*, 995 F.2d 1299, 1304 (5th Cir.), *cert. denied*, 510 U.S. 978, 114 S.Ct. 472, 126 L.Ed.2d 424 (1993)) ("To be found 'incredible' as a matter of law, the witness' testimony must be factually impossible.") (citing *United States v. Lindell*, 881 F.2d 1313, 1322 (5th Cir. 1989), *cert. denied*, 496

20

U.S. 926, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990) and *United States v. Silva*, 748 F.2d 262, 266 (5th Cir. 1984))). As the jury could reasonably credit Chavez's testimony regarding Sanchez's involvement in the offense notwithstanding Sanchez's and Castro's testimony, we find that sufficient evidence was adduced at trial to support the jury's finding that Sanchez was guilty of the crime charged.

C. EXTRINSIC EVIDENCE

DeLuna asserts that the district court erred in admitting into evidence his March 1994 arrest in Louisiana and the corresponding seizure of 54 pounds of marijuana. DeLuna contends that the evidence was extrinsic and its admission violated Federal Rule of Evidence 404(b).[2]

DeLuna's contention lacks merit. "An act is not extrinsic, and Rule 404(b) is not implicated, where the evidence of that act and the evidence of the crime charged are inextricably intertwined." *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir.), *cert. denied*, 115 S.Ct. 531 (1994)(quoting *United States v. Torres*, 685 F.2d 921, 924 (5th Cir. 1982)).

The evidence of DeLuna's participation in the transit of a bale of marijuana in Louisiana in March of 1994 was not extrinsic evidence because it was inextricably intertwined with the evidence

---

[2]Rule 404(b) provides in part: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

of the charged criminal conspiracy going on at that time and was relevant to DeLuna's knowledge and voluntary participation in the conspiracy. *See Garcia, id.* Under all of the circumstances of record, it could reasonably be inferred that the 54-pound bale of marijuana seized was part of a larger load of marijuana that was transported from Laredo to Dallas. DeLuna does not contest the evidence indicating that he assumed a central role throughout the charged conspiracy by driving, storing, loading, and delivering loads of marijuana and instructing others in connection with the conspiracy. In fact, Joe Chavez indicated that DeLuna continued to actively involve himself in the charged conspiracy by storing 200 pounds of marijuana at his house shortly preceding DeLuna's Louisiana arrest in March of 1994. Under the circumstances, a reasonable inference may be drawn that DeLuna's involvement in transportation of marijuana in March 1994 was part of the ongoing charged conspiracy. Prior to this DeLuna had been involved in numerous shipments of marijuana from Laredo to Dallas. DeLuna was arrested and the marijuana was seized 300 miles from Dallas on Interstate 20, the primary east-west artery serving that city. The driver of the vehicle that DeLuna occupied was identified at trial by the Louisiana State Trooper as Selso Pena. Juan Barraza linked Selso Pena to the conspiracy during Barraza's testimony describing his own extensive involvement in the charged conspiracy. Barraza testified that Pena assisted him and Pablo DeLuna in searching for

22

marijuana in a field near Laredo, Texas in late January 1994. The method employed in transporting the drugs in the March, 1994 episode was consistent with the manner used repeatedly during the charged conspiracy, *i.e.*, two vehicles were used, with one carrying the drugs and the other serving as an escort or decoy. Louisiana State Trooper Stephens testified that the vehicle in which DeLuna was an occupant, the "escort" vehicle, was being operated in a strange manner. He testified that before he stopped it, the vehicle's speed was erratic and it was swerving all over the road. Considering all of these factors, we conclude that the evidence of DeLuna's acts in March, 1994 were not extrinsic, and Rule 404(b) is not implicated, because that evidence and the other evidence of the crime charged are so similar and inextricably intertwined as to form a part of the same ongoing conspiracy.

D. PROSECUTORIAL MISCONDUCT

Armando Trevino contends that the trial court committed plain error in allowing the government to comment on his presumption of innocence, to argue that it had secret knowledge of his guilt, to argue that he victimized the jury by putting them through a two-week trial, and to comment on his failure to testify. Juan Trevino contends that the prosecutor improperly argued to the jury that the attorney for a key defense witness did not believe the witness's statement that Juan Trevino was not involved in the conspiracy.

Armando Trevino's contention is manifestly without merit. He

23

asserts that the prosecutor's statement at closing argument that "we're going to spend two years of investigation and two weeks of trial to get these guys" constitutes plain error. A prosecutor's remarks to the jury constitute reversible error only when they are so improper so as to effect the appellants' substantial rights. *United States v. Lowenberg*, 853 F.2d 295, 301 (5th Cir. 1988). In determining whether improper remarks affect a defendant's substantial rights, the court should consider: (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instruction; and (3) the strength of the evidence of the defendant's guilt. *United States v. McPhee*, 731 F.2d 1150, 1152 (5th Cir. 1984). "A conviction should not be set aside if the prosecutor's conduct . . . did not in fact contribute to the guilty verdict and was, therefore, legally harmless." *United States v. Beckett*, 706 F.2d 519, 520 (5th Cir. 1983). *See also United States v. Rodriguez*, 43 F.3d 117, 124 (5th Cir.), *cert. denied*, 115 S.Ct. 2260 (1995) ("To warrant reversal of a conviction, prosecutorial misconduct must be so pronounced and persistent that it casts serious doubts upon the correctness of the jury's verdict.")(citation omitted). Moreover, "the closing argument must be analyzed in the context of the entire trial to determine whether it affected substantial rights of the accused." *Rodriguez*, *id.* (citing *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)).

Applying the above precepts to Armando Trevino's contention, we find that the prosecutor's remarks clearly do not rise to a level that requires reversal. Abundant evidence was introduced at trial demonstrating Armando Trevino's role as an active participant in an extensive drug conspiracy. Further, the prosecutor's remarks were not exceedingly prejudicial. Significantly more egregious remarks have not formed the basis for reversal by this court. *See e.g., United States v. Frascone*, 747 F.2d 953, 957-58 (5th Cir. 1984)(where the prosecutor's remarks at closing "[l]et me point out something to you, Ladies and Gentleman. I take an oath to see that justice is done. They take an oath to represent their client zealously" did not form the basis for reversal).

Similarly, Juan Trevino's argument is not persuasive. His assignment of error is based on remarks made by the prosecutor during her closing argument concerning a letter from defense witness Fernando Quiroz's attorney to Quiroz that was introduced to impeach Quiroz's testimony that he had been offered a four-year plea agreement for his cooperation. In admitting the letter into evidence, the court required that the following sentence be deleted: "Remember that at the last interview we had with assistant U.S. attorney Simms [sic] that interview ended with you lying to her about her questions regarding [Juan Trevino]." The balance of the letter suggested that Quiroz would greatly benefit by cooperating with the Government and that it was possible that

25

his sentence could be reduced to four and one-half to six years. The prosecutor's remarks made in closing argument in reference to the letter that Juan Trevino asserts constituted reversible error were as follows:

> [T]here's a letter in evidence that I want you folks to read from his lawyer trying to convince him to tell the truth. And you know what the sticking point is? I may not be quoting this verbatim, I don't see that letter right now, he wants it in writing that I'll help him out and that I'll get him out of jail before he has to testify. That's his problem. That's what Fernando Quiroz wants and we wouldn't agree to it. That's what he's upset about. It doesn't have anything to do with loyalty to his buddies and just coming in here and telling the truth. He could not get what he wanted and he's lied. And his attorney is trying to talk to him about do something here [sic]. You are in trouble. Help yourself out. Tell them the truth. Don't insist on this conspiracy stuff
> ....

It is difficult to infer anything prejudicial or harmful to Juan Trevino's case from these remarks. In the context of the above remarks Juan Trevino's name was not mentioned. The jury was not shown or told of the deleted portion of the letter written by Quiroz's attorney. Consequently, we are not persuaded by Trevino's contention that the prosecutor's remarks "effectively" communicated to the jury that Quiroz's attorney believed that Quiroz had lied to the U.S. attorney about Juan Trevino. Moreover, as with respect to Armando Trevino, copious evidence was introduced at trial supporting Juan Trevino's conviction.

26

E.  THE ALLEN CHARGE

Armando Trevino and Pedro Sanchez contend that the district court erred in giving an "Allen" charge to the jury.[3]  This contention is meritless.  The standard of review is  abuse of discretion. *United States v. Lindell*, 881 F.2d 1313, 1320-21 (5th Cir. 1989); *United States v. Nichols*, 750 F.2d 1260, 1266 (5th Cir. 1985).  We examine the Allen charge for compliance with two requirements:  "(1) the semantic deviation from approved  'Allen' charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved  'Allen' charge must not be coercive."  *Lindell*, *id.* (citing *United States v. Bottom*, 638 F.2d  781, 787 (5th Cir. 1981) (citing *United States v. Bailey*, 468 F.2d 652 (5th  Cir. 1972), *aff'd en banc*, 480 F.2d 518 (5th Cir.1973))).

The charge used by the trial court meets the first criteria; it substantially comports with the pattern modified Allen charge language repeatedly approved by this Court.  *See, e.g.*, *United States v. Nguyen*, 28 F.3d 477, 485 (5th Cir. 1994); *United States v. Pace*, 10 F.3d 1106, 1122 (5th Cir. 1993); *United States v. Lindell*, 881 F.2d 1313, 1321 (5th Cir. 1989); *United States v. Kelly*, 783 F.2d 575, 576-77 (5th Cir.), *cert. denied*, 479 U.S. 889

---

[3]The term "*Allen* charge" refers to *Allen v. United States*, 164 U.S. 492 (1896).  It is used in reference to supplemental instructions urging a jury to forego their differences and come to a unanimous decision.

(1986).

In evaluating the totality of the circumstances surrounding the use of the charge, we proceed on a case by case basis. *Lindell*, 881 F.2d at 1321. In this case, the jury retired to deliberate on a Thursday at 4:00 p.m. On the following day at 2:05 p.m. the jury sent a note stating that they were deadlocked. Over the objections of defense counsel, the modified Allen charge was given to the jury. The jury returned its verdict finding all five of the appellants guilty on the conspiracy count the following Monday at 8:54 a.m. In the context of this case, we perceive no evidence of coercion to justify reversal. The district court informed the jury that each juror should remain true to his or her own conscience, that they could take as much time as they needed to reach a verdict, and expressed no opinion as to what kind of verdict the court preferred. Moreover, contrary to appellants' assertion, the fact that a verdict is rendered relatively soon after an Allen charge is given is not necessarily evidence of a coercive atmosphere. *See United States v. Bottom*, 638 F.2d 781, 788 (5th Cir. 1981)(three hour time span between Allen charge and verdict was not unduly short).

F. SENTENCING

Juan Trevino, Armando Trevino, Pedro Sanchez, and Jorge Espinoza all assign points of error involving their sentencing. Because we find no merit in Juan Trevino's, Armando Trevino's, and

Pedro Sanchez's sentencing arguments, we reject them without further comment.

With regard to Jorge Espinoza, the district court attributed 2100 pounds of marijuana in sentencing him. A district court's findings about the quantity of drugs attributed to a defendant are factual findings subject to a clearly erroneous standard of review. *United States v. Rivera*, 898 F.2d 442, 445 (5th Cir. 1990).

At Espinoza's sentencing, the district court based its 2100 pound finding solely on DEA agent Routh's recollection of trial testimony that Espinoza transported 7 shipments of marijuana which averaged 300 pounds. One of the seven loads counted against Espinoza was the shipment of October 5, 1993, which resulted in the arrest of Espinoza and Pedro Sanchez and the seizure of 282 pounds of marijuana. Espinoza does not contest the estimated per load weight of 300 pounds used to calculate the amount of drugs attributable to him. He does assert, however, that in addition to the load seized pursuant to his arrest on October 5, 1993, the record does not support that he participated in six other shipments of drugs. Espinoza specifically attacks Routh's recollection of the trial testimony of Joe Chavez, Juan Barraza, and Hipolito Ortiz.

As both Espinoza and the Government concede, the testimony of Joe Chavez, Juan Barraza, and Hipolito Ortiz constitutes all of the record evidence on this issue and is thus determinative of the

quantity of drugs attributable to Espinoza. The record reveals that Ortiz testified that, to his knowledge, there were only five marijuana shipments involving Border Freight trucks, that Ortiz identified Espinoza as the driver on only two of those shipments, and that on the three other trips the driver was Fred Tejeda. Chavez knew of only two deliveries that Espinoza made using Border Freight trucks. Juan Barraza testified that he knew of only one Border Freight trip where Espinoza was involved. No evidence was introduced as to whether Espinoza knew of or was acquainted with Fred Tejeda, the other Border Freight truck driver, in any way.

Despite our deference to the district court, we agree with Espinoza that Routh's recollection of the evidence at Espinoza's sentencing hearing was inaccurate and the district court in relying solely on Routh's testimony clearly erred in attributing 2100 pounds of marijuana to Espinoza. The record contains only five references to Espinoza as a transporter of drugs; the two occasions each testified to by Ortiz and Chavez and the one time testified to by Barraza. One of the incidents Chavez referred to was the October 5 arrest and seizure of 282 pounds of marijuana. Therefore, at maximum, the record supports the attribution of 1482 pounds of marijuana to Espinoza. Accordingly, the sentence must be vacated and Espinoza's case remanded for resentencing.

CONCLUSION

For the reasons assigned, each defendant-appellant's conviction is AFFIRMED, and each of their sentences is AFFIRMED,

30

except for Espinoza's sentence, which is VACATED, and his case is remanded for purposes of resentencing.